[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14537
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cr-20406-KMM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANDRES QUINTANILLA,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 19, 2016)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Andres Quintanilla, a former sergeant with the Miami Springs Police Department, appeals his sentence of 108 months of imprisonment after pleading guilty, under a written plea agreement, to one count of Hobbs Act extortion under color of official right, 18 U.S.C. § 1951(a).  Quintanilla raises two arguments on appeal: (1) the sentence appeal waiver in his plea agreement is unenforceable because the government breached the plea agreement by breaking a promise made during the plea colloquy; and (2) the district court erred in enhancing Quintanilla's offense level by two levels, per U.S.S.G. § 2B1.1, and refusing to reduce his offense level by two levels, per U.S.S.G. §§ 2D1.1(b)(17) and 5C1.2(a)(2),[1] after finding that Quintanilla possessed a firearm in connection with the offense.  After careful review, we decline to enforce the appeal waiver and affirm Quintanilla's sentence.

## I.

We review the validity of a sentence appeal waiver provision *de novo*. *United States v. Johnson*, 541 F.3d 1064, 1066 (11th Cir. 2008).  Generally, we will enforce an appeal waiver that was made knowingly and voluntarily. *United States v. Bushert*, 997 F.2d 1343, 1350–51 (11th Cir. 1993).  To establish that the waiver was made knowingly and voluntarily, the government must show either that (1) the district court specifically questioned the defendant about the waiver during

---

[1] All guidelines references are to the 2014 version of the Guidelines Manual.

2

the plea colloquy, or (2) "it is manifestly clear from the record that the defendant otherwise understood the full significance of the waiver." *Id.* at 1351.

Here, we decline to enforce the appeal waiver. Putting aside the question of whether the government breached the plea agreement, the government has not shown that the waiver was made knowingly and voluntarily.[2] *See id.* While the magistrate judge who conducted Quintanilla's plea colloquy read out loud the terms of the waiver during the colloquy, she did not specifically question Quintanilla about the waiver or confirm that he understood what those terms meant. Moreover, Quintanilla's response to the magistrate judge's explanation of the waiver, "Okay," does not clearly show that he understood the magistrate judge's explanation, and the government has not identified parts of the record that make "manifestly clear" his understanding of the full significance of the waiver. Therefore, the government has not shown either of the two routes under *Bushert* for establishing the validity of the waiver. *See id.*

And because the government has briefed Quintanilla's guidelines challenges, we neither burden nor prejudice the government by enforcing the waiver. *Cf. United States v. Bascomb*, 451 F.3d 1292, 1294 (11th Cir. 2006) ("[R]equiring the

---

[2] The government notes that Quintanilla challenged the appeal waiver on only the ground that the plea agreement was breached, and it limits its arguments to the breach issue. But it is the *government's* burden to show that the appeal waiver was made knowingly and voluntarily, and it has not done so here, no matter what Quintanilla argued. *See Bushert*, 997 F.2d at 1351. Because the only remedy Quintanilla requested for the government's alleged breach was invalidation of the waiver and we decline to enforce the waiver here, we need not and do not decide whether the government breached the plea agreement.

government to file a brief where there has been a valid appeal waiver undermines the interests of both the government and defendants generally."). We therefore do not enforce the sentence appeal waiver in Quintanilla's plea agreement.

## II.

Turning to the merits, Quintanilla argues that no evidence supports the district court's finding that he possessed a firearm in connection with the offense. As a result, he asserts, the court erred in applying the two-level enhancement for possession of a firearm, per U.S.S.G. § 2D1.1(b)(1), and in refusing to apply a two-level reduction for meeting the safety-valve criteria, per U.S.S.G. § 2D1.1(b)(17) (providing for a two-level reduction if the defendant meets the five requirements set forth in U.S.S.G. § 5C1.2(a)). One of the five requirements under § 5C1.2(a) is that the defendant not have "possess[ed] a firearm . . . in connection with the offense." U.S.S.G. § 5C1.2(a)(2).

## A.

Quintanilla was a sergeant with the Miami Springs Police Department. Near the end of 2014, he began having conversations with a confidential source working with the Federal Bureau of Investigation. The source told Quintanilla that he was a drug trafficker who imported cocaine shipments through the Miami International Airport. Quintanilla agreed to help.

4

In November 2014, the source told Quintanilla about an upcoming shipment of ten kilograms of cocaine that the source planned to sell in the City of Miami Springs. Quintanilla helped choose a date and location for the planned drug deal. On December 5, 2014, Quintanilla, while on duty, met the source at the agreed-upon location, a grocery store parking lot, where the source showed Quintanilla fake cocaine and indicated that it was being sold for $250,000. Quintanilla then left the parking lot for a brief period while the sale was completed. Later, Quintanilla told the source that he left the parking lot to distract a police detective he had seen in the area. After the sale, Quintanilla, in his patrol car, followed the source's car to a shipping facility, where the source said the drug proceeds would be dropped off in order to be laundered elsewhere. Quintanilla was paid $2,500 for his assistance.

Before sentencing, Quintanilla's revised presentence investigation report ("PSR") calculated his offense level using the drug-trafficking guideline, § 2D1.1, because Quintanilla committed his extortion offense for the purpose of facilitating a drug offense. U.S.S.G. § 2C1.1(c)(1). Under the drug-trafficking guideline, a two-level enhancement was added because "a dangerous weapon (a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). In his objections to the PSR, Quintanilla did not dispute that he possessed a firearm, but he asked for a two-level reduction under §§ 2D1.1(b)(17) and § 5C1.2(a)(2) because, he contended, his possession of

a firearm was not in connection with the offense. In a second addendum to the PSR, the probation officer disagreed with Quintanilla that a two-level reduction was applicable "because the defendant, while armed, provided protection for and escorted drug proceeds."

Quintanilla pressed his § 5C1.2(a)(2) argument at sentencing, contending that his service firearm, though possessed, had no connection to the offense. Sentencing Hr'g Tr. at 4 (Doc. 37) (stating that "the firearm was not used in furtherance of any of the crime and that it does not preclude him from the benefits of § 5C1.2(a)(2)"); *id.* at 5 ("The firearm happened to be present on him, but there is no evidence that it was used in furtherance of the crime."); *id.* ("There was never any circumstance in which that weapon was ever involved in any way or took part in the case itself. He was in a vehicle. There was never any circumstance where it was [employed] or used in furtherance of the crime. Again, my client pled to a bribery case."). Over Quintanilla's objections, the district court agreed with the probation officer and found that Quintanilla possessed the firearm in connection with the drug offense. The court applied the § 2D1.1(b)(1) enhancement but did not apply the § 2D1.1(b)(17) reduction. The district court sentenced Quintanilla to 108 months of imprisonment, at the low end of his guideline range.

**B.**

6

We review a district court's factual findings, including a finding that a defendant possessed a firearm, for clear error. *United States v. Carillo-Ayala*, 713 F.3d 82, 87 (11th Cir. 2013); *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). The district court's legal interpretations of the Sentencing Guidelines are reviewed *de novo*. *Carillo-Ayala*, 713 F.3d at 87. While we review *de novo* the legal standard that the district court applies, we generally review for clear error the court's application of the standard to a detailed fact pattern. *Id.* at 87–88. We will not find clear error unless we are left with a definite and firm conviction that a mistake has been made. *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003).[3]

Under § 2D1.1(b)(1), a defendant's offense level is increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed." To prove that the enhancement applies, the government bears the burden of showing, by a preponderance of the evidence, either "that the firearm was present at the site of the charged conduct or . . . that the defendant possessed a firearm during conduct associated with the offense of conviction." *Stallings*, 463 F.3d at 1220; *United States v. Hunter*, 172 F.3d 1307, 1309 (11th Cir. 1999). If the government meets its burden, "the evidentiary burden shifts to the defendant, who must demonstrate

---

[3] Quintanilla did not object to the district court's application of the § 2D1.1(b)(1) firearm-possession enhancement on the grounds he raises on appeal, so we would normally review for plain error only. In any case, he preserved his interrelated challenge under § 5C1.2(a)(2), and our inquiry into both guidelines is substantially the same. Accordingly, we do not apply plain-error review.

that a connection between the weapon and the offense was 'clearly improbable.'" *Stallings*, 463 F.3d at 1220 (quoting *United States v. Audain*, 254 F.3d 1286, 1289 (11th Cir. 2001)).

Section § 2D1.1(b)(17) likewise implicates a defendant's possession of a firearm, providing for a two-level decrease in the offense level if, among other criteria listed in § 5C1.2(a), the defendant "did not . . . possess a firearm or other dangerous weapon . . . *in connection with the offense*." U.S.S.G. § 5C1.2(a)(2) (emphasis added). We have held that possession "in connection with" means something more than possession, so a defendant may possess a firearm, for purposes of § 2D1.1(b)(1), without possessing the firearm "in connection with the offense," for purposes of § 5C1.2(a)(2). *Carillo-Ayala*, 713 F.3d at 89–91.

Where a defendant who possessed a firearm seeks the protection of the safety valve, § 5C1.2(a) (in this case, by way of § 2D1.1(b)(17)), "the district court must determine whether the facts of the case show that a connection between the firearm and the offense, though possible, is not probable." *Id.* at 91. The defendant may negate proof of a connection by a preponderance of the evidence, or the government may preclude relief by proving the fact of a connection by a preponderance of the evidence. *Id.* at 96.

A sufficient "connection" between the firearm and the offense may be shown if the firearm is in proximity to drugs or if the firearm facilitates or has the

potential to facilitate the drug offense. *Id.* at 91–96. Facilitation, in turn, includes "emboldening an actor who had the ability to display or discharge the weapon, . . . serving as an integral part of a drug transaction as in a barter situation, . . . instilling confidence in others who relied on the defendant, or serving as a 'badge of office' to help the defendant avoid detection." *Id.* (citations omitted). For example, we have concluded that an INS agent's possession of a firearm while escorting a drug courier through an airport facilitated the offense because the firearm's presence increased the chances for successful drug trafficking, both by instilling confidence in the drug courier and "diminish[ing] the likelihood that someone [would] look at him suspiciously." *Id.* at 94–95 (discussing the facts of *Audain*, 254 F.3d at 1289).

We analyze the provisions of § 2D1.1(b)(1) and § 5C1.2(a)(2) by reference to the defendant's relevant conduct. *See Stallings*, 463 F.3d at 1220; U.S.S.G. § 5C1.2 cmt. n.3 (the term "offense" for § 5C1.2(a)(2) means "the offense of conviction and all relevant conduct"). So although Quintanilla's offense of conviction was Hobbs Act extortion, we evaluate the application of the two guideline provisions based on his relevant conduct, which includes his facilitation of what he believed to be a transaction involving ten kilograms of cocaine.

Here, the district court did not err in applying § 2D1.1(b)(1) or in refusing to apply § 2D1.1(b)(17). First, the court did not clearly err in finding that Quintanilla

possessed a firearm during conduct relevant to the offense. *See Stallings*, 463 F.3d at 1220. Quintanilla was an on-duty police officer during relevant conduct. He also did not dispute factual statements in the second addendum to the PSR stating that he was "armed" during conduct related to the December 5, 2014, cocaine transaction, so he is deemed to have admitted those facts for purposes of sentencing. *See United States v. Bennett*, 472 F.3d 825, 832 (11th Cir. 2006) ("A sentencing court's findings of fact may be based on undisputed statements in the [PSR]."); *id.* at 833–34 ("Bennett failed to object to the facts of his prior convictions as contained in his [PSR] and addendum to the [PSR] despite several opportunities to do so; thus, he is deemed to have admitted those facts."). Indeed, far from objecting to the fact of his possession of a firearm, Quintanilla, through counsel, admitted multiple times during the sentencing hearing, recounted above, that he possessed a firearm during conduct relevant to the offense. Therefore, the facts adequately establish that Quintanilla possessed a firearm during the offense.

Second, the district court did not clearly err in finding that Quintanilla's possession of the firearm was in connection with the offense, because the firearm facilitated or had the potential to facilitate the offense. *See Carillo-Ayala*, 713 F.3d at 87–88, 95–96. The record shows that Quintanilla admitted that he had agreed to provide cover and protection for a drug trafficker transporting ten kilograms of cocaine. In particular, during the plea colloquy, Quintanilla agreed

with the prosecutor's statement that he had "agreed he would watch over the drug transaction in the City of Miami Springs and protect the confidential information source from something going wrong." Plea Hr'g Tr. at 35 (Doc. 29). Acting on that agreement, Quintanilla, while armed, met with the source on the planned date of the drug sale and then followed the source as the source drove with the drug proceeds to another location.

Based on these facts, Quintanilla's firearm facilitated or had the potential to facilitate the offense because it was available for use as a weapon in order to protect the confidential source "from something going wrong," most notably while the source drove, purportedly, with a substantial amount of drug proceeds. *See Carillo-Ayala*, 713 F.3d at 95–96. For similar reasons, the firearm had the potential to facilitate the offense by instilling confidence in the person who hired Quintanilla for protection. *See id.*

In sum, Quintanilla's possession of a firearm while providing cover and protection for a drug transaction was sufficient to show both possession of a firearm, § 2D1.1(b)(1), and possession of a firearm in connection with the offense, § 5C1.2(a)(2). Accordingly, the district court did not err in calculating Quintanilla's guideline range. We therefore affirm Quintanilla's sentence.

**AFFIRMED.**